RECORD NO. 15-1559

In The

# United States Court of Appeals
## For The Fourth Circuit

## ST. PAUL MERCURY INSURANCE COMPANY,

*Plaintiff – Appellee*,

**v.**

## AMERICAN BANK HOLDINGS, INC.,

*Defendant – Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT

———————

**BRIEF OF APPELLANT**

———————

**Albert J. Mezzanotte, Jr.**
**Dwight W. Stone, II**
**WHITEFORD, TAYLOR & PRESTON, LLP**
**Seven Saint Paul Street, Suite 1300**
**Baltimore, Maryland 21202-1626**
**(410) 347-8700**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. ___15-1559___     Caption: _American Bank Holdings, Inc. v. St. Paul Mercury Insurance Company_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_American Bank Holdings, Inc._
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                              ☐YES ☑NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/ Dwight W. Stone, II__    Date: __June 3, 2015__

Counsel for: __Appellant__

## CERTIFICATE OF SERVICE
**************************
I certify that on ___June 3, 2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__/s/ Dwight W. Stone, II__                                      __June 3, 2015__
(signature)                                                              (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ......................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS .......................................................................6

    I.    THE ST. PAUL POLICY ..............................................................6

    II.    THE CLAIM HISTORY ...............................................................10

        A.    The Cueto Action .......................................................10

        B.    The Claim Handling by St. Paul ...............................13

        C.    ABHI Defends and Prevails in the Cueto Action .....17

SUMMARY OF THE ARGUMENT ......................................................17

STANDARD OF REVIEW ....................................................................19

ARGUMENT ........................................................................................20

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT TO ST. PAUL, AND DENYING SUMMARY JUDGMENT TO
        ABHI, AS TO ST. PAUL'S OBLIGATION TO REIMBURSE ABHI FOR
        THE CUETO ACTION DEFENSE FEES AND COSTS ...................20

        A.    The Policy Covers ABHI's Defense Fees and Costs................20

        B.    St. Paul's Late Notice Defense Fails as a Matter of Law .........21

            1.    ABHI's Notice to St. Paul Was Not Late ......................21

i

2.      St. Paul Was Required to Demonstrate It Suffered
        Actual Prejudice Resulting from the Allegedly
        Late Notice......................................................................24

3.      St. Paul Did Not and Cannot Prove Its Position Is
        Any Different Than If Notice Had Been Provided
        "Timely" – *i.e.*, by November 29, 2008 ..........................25

4.      The District Court Erred in Allowing St. Paul to
        Reinvent Its Late Notice Theory During Summary
        Judgment Briefing ...........................................................27

5.      St. Paul Presented No Proof of Actual Prejudice as
        Required by Maryland Law .............................................29

C.      St. Paul's Breach of Duty to Defend Theory Fails as a
        Matter of Law............................................................................40

II.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT TO ST. PAUL DESPITE KEY DISPUTES OF MATERIAL
        FACT...................................................................................................47

A.      ABHI's Waiver and Estoppel Defenses, Which Turn on
        Disputed Material Facts, Made Summary Judgment
        Inappropriate .............................................................................48

B.      Abundant Evidence, Both Undisputed and Disputed,
        Demonstrates St. Paul's Lack of Good Faith in Handling
        the Cueto Claim and Precluded Entry of Summary
        Judgment in St. Paul's Favor on ABHI's Statutory Claim.......51

CONCLUSION ................................................................................................57

REQUEST FOR HEARING ...........................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All Class Const., LLC  v. Mutual Ben. Ins. Co.*,
  3 F. Supp. 3d 409 (D. Md. 2014)....................................................................53

*Allstate Ins. Co. v. Reliance Ins. Co.*,
  786 A.2d 27 (Md. 2001) ...............................................................................48

*Allstate Ins. Co. v. State Farm Auto Ins. Co.*,
  767 A.2d 831 (Md. 2001) ...............................................................32, 33, 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................19, 49

*Cecilia Schwaber Trust Two v. Hartford Acc. & Indem. Co.*,
  636 F. Supp. 2d 481 (D. Md. 2009)..........................................................52, 53

*Colleton Preparatory Acad., Inc. v. Hoover Universal*,
  616 F.3d 413 (4th Cir. 2010) ........................................................................22

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ........................................................................38

*Delatorre v. Safeway Ins. Co.*,
  989 N.E.2d 268 (Ill. App. Ct. 2013)........................................................44, 45

*Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*,
  699 A.2d 482 (Md. Ct. Spec. App. 1997).....................................................24

*General Accident Ins. Co. v. Scott*,
  669 A.2d 773 (Md. 1996) .............................................................................37

*Hartford Ins. Co. v. Annapolis Bay Charters*,
  69 F. Supp. 2d 756 (D. Md. 1999)................................................................51

*Hayes v. Douglas Dynamics, Inc.*,
  8 F.3d 88 (1st Cir. 1993)..................................................................38

*Heil Co. v. Evanston Ins. Co.*,
  No. 1:05-cv-284, 2009 WL 596001 (E.D. Tenn. Mar. 6, 2009) .......42, 43, 44

*Henson v. Liggett Group, Inc.*,
  61 F.3d 270 (4th Cir. 1995) ..........................................................19

*Ins. Co. of N. Am. v. Coffman*,
  451 A.2d 952 (Md. Ct. Spec. App. 1982)......................................49

*Maynard v. Westport Ins. Corp.*,
  208 F. Supp. 2d 568 (D. Md. 2002).............................................51

*McDowell Bldg., LLC v. Zurich Am. Ins. Co.*,
  Case No. 12-2876, 2015 U.S. Dist. LEXIS 60350
  (D. Md. May 7, 2015).....................................................................31

*Med. Mut. Liability Ins. Soc. of Maryland v. Miller*,
  451 A.2d 930 (Md. Ct. App. 1982) ..............................................51

*Millenium Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins.*,
  893 F. Supp. 2d 715 (D. Md. 2012),
  *rev'd and remanded on other grounds*,
  744 F.3d 279 (4th Cir. 2014) .......................................................53

*Minnesota Lawyers Mut. Inc. Co. v. Baylor & Jackson, PLLC*,
  531 F. App'x. 312 (4th Cir. 2013).......................................... 30-31

*New York State Ophthalmological Soc. v. Bowen*,
  854 F.2d 1379 (D.C. Cir. 1988)....................................................38

*Overstreet v. Kentucky Cent. Life Ins. Co.*,
  950 F.2d 931 (4th Cir. 1991) ................................................. 19-20

*Prince George's County v. Local Government Insurance Trust*,
  879 A.2d 81 (Md. 2005) ................................................................31

iv

*Rossignol v. Voorhaar*,
  316 F.3d 516 (4th Cir. 2003) ..........................................................................20

*Scottsdale Ins. Co. v. Harris*,
  159 F. Supp. 2d 918 (E.D. La. 2001) ........................................................22, 23

*Sherwood Brands, Inc. v. Great American Ins. Co.*,
  13 A.3d 1268 (Md. 2011) .....................................................................*passim*

*St. Paul Fire & Marine Ins. Co. v. Molloy*,
  433 A.2d 1135 (Md. 1981) .................................................................48, 49

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
  29 F.3d 137 (4th Cir. 1994) ..........................................................................38

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
  612 F.3d 724 (4th Cir. 2010) ......................................................................28

*Wahi v. Charleston Area Med. Ctr., Inc.*,
  562 F.3d 599 (4th Cir. 2009) ......................................................................28

*Washington v. Federal Kemper Insurance Co.*,
  482 A.2d 503 (Md. Ct. Sp. App. 1984) .....................................................30

*Woodfin Equities Corp. v. Harford Mutual Ins. Co.*,
  678 A.2d 116 (Md. Ct. Spec. App.), *rev'd in part on other grounds*,
  687 A.2d 652 (Md. 1997) ..................................................................35, 36, 37

## **STATUTES**

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1332 ..........................................................................................1

28 U.S.C. § 1367 ..........................................................................................1

28 U.S.C. § 2201 ..........................................................................................1

28 U.S.C. § 2202 ..........................................................................................1

Md. Code Ann., Cts. & Jud. Proc. § 3-1701 ................................................2, 3, 19, 52

Md. Code Ann., Cts. & Jud. Proc. § 3-1701(a)(4)...................................................52

Md. Code Ann., Ins. § 19-110 .................................................................*passim*

Md. Code Ann., Ins. § 27-1001 ...........................................................2, 3, 19, 52

## **RULE**

Fed. R. Civ. P. 30(b)(6).........................................................................26, 41

# JURISDICTIONAL STATEMENT

This is an appeal from an order dated April 22, 2015 by the Honorable Roger W. Titus, United States District Court Judge for the District of Maryland, granting Appellee's motion for summary judgment, denying Appellant's cross-motion for partial summary judgment, and awarding declaratory relief.

The district court had jurisdiction over the subject matter of the case pursuant to 28 U.S.C. §§ 1332, 2201 and 2202 because ABHI and St. Paul are citizens of different states, there is an actual controversy between the parties, and the amount in dispute exceeds $75,000.00, exclusive of interest and costs. The district court had supplemental jurisdiction over ABHI's counterclaim against St. Paul pursuant to 28 U.S.C. § 1367, to the same extent St. Paul's complaint against ABHI was properly before the district court.

This Court has jurisdiction over Appellant's appeal pursuant to 28 U.S.C. § 1291. The district court's April 22, 2015 order is a final order. Appellant filed a timely notice of appeal on May 21, 2015.

## ISSUES PRESENTED FOR REVIEW

1.    May an insurer avoid coverage based on late notice when Maryland law requires proof of actual prejudice, the insurer has no evidence it was actually prejudiced by not receiving notice by the reporting deadline it relied on in denying coverage and throughout the coverage litigation, and the court's entry of summary judgment for the insurer is based on the insurer's new theory of when notice was due, which it raised for the first time in its summary judgment reply memorandum?

2.    Under Maryland law, where a professional liability insurance policy assigns an undefined "duty to defend" to an insured and the insured prevails in the underlying case by vacating default judgments entered against it, is the insurer entitled to summary judgment that it has no obligation to reimburse any defense costs because the insured's mistake allowed entry of default judgments, thus breaching its "duty to defend" as a matter of law?

3.    Under Maryland law, is an insurer entitled to summary judgment that it has no statutory liability for failing to act in good faith, pursuant to Md. Code Ann., Insurance § 27-1001 and Cts. & Jud. Proc. § 3-1701, when it (a) notifies its insured that a claim is covered and instructs the insured to defend the claim vigorously, (b) performs no substantive investigation of the claim, (c) prepares a reservation of rights letter rather than a coverage denial, but then decides to deny the claim on a technical late notice defense when it learns the claim will be

2

expensive and difficult to defend, (d) raises only one coverage defense (late notice) in denying coverage and instituting coverage litigation, and (e) raises new defenses during the coverage litigation, including a new late notice theory not raised until filing a summary judgment reply memorandum?

## STATEMENT OF THE CASE

This case involves a denial of insurance coverage by Appellee St. Paul Mercury Insurance Company ("St. Paul") under a Bankers Professional Liability policy (the "Policy") issued to Appellant American Bank Holdings, Inc. ("ABHI"). (JA-897). St. Paul denied coverage to ABHI for its costs in defending a 2008 default judgment in Illinois state court that ABHI successfully defeated on appeal (the "Cueto Action"). While the Cueto Action was pending, St. Paul filed a declaratory judgment action in the district court seeking a determination that it had no duty to defend or indemnify ABHI because the notice to St. Paul of the claim was untimely under St. Paul's interpretation of the claims-made Policy. (JA-17; DE-1). ABHI filed counterclaims seeking a declaration that St. Paul owed coverage for the Cueto Action, and seeking damages for St. Paul's failure to act in good faith, pursuant to Md. Code Ann., Insurance § 27-1001 and Cts. & Jud. Proc. § 3-1701. (JA-25; DE-7).

The default judgments were entered before ABHI knew of the claim. ABHI's registered agent forwarded the Cueto papers to the attention of a former

employee, and ABHI did not learn of the claim until Cueto attempted to enforce the judgments in Maryland courts. (JA-951). Promptly after learning of the judgments ABHI notified St. Paul on February 25, 2009. (JA-1143). Although St. Paul disputes this fact, it told ABHI that the claim was covered, and instructed ABHI to vigorously defend and seek to vacate the default judgments. St. Paul issued no reservation of rights letter. (JA-1879 – 1882). Almost two months later, on April 15, 2009, at the conclusion of a status teleconference with ABHI's general counsel, St. Paul's claims counsel announced it was denying coverage based on late notice. It sent out a denial letter and filed the declaratory judgment action the same day, raising only a late notice defense—that ABHI failed to provide notice by an asserted reporting deadline of November 29, 2008. (JA-22; DE-1 at ¶ 24).

At the parties' request the district court stayed the coverage litigation while the Cueto Action was litigated. (JA-280; DE-41). ABHI prevailed on appeal; the Illinois appellate court concluded that Illinois courts lacked personal jurisdiction over ABHI. (JA-1278). During the stay, the Court of Appeals of Maryland issued a decision confirming that, contrary to St. Paul's position, Maryland law requires an insurer to prove actual prejudice in order to deny coverage for both "pure" claims-made policies and "claims-made-and-reported" policies.[1] *St. Paul suffered*

---

[1]    *Sherwood Brands, Inc. v. Great American Ins. Co.*, 13 A.3d 1268 (Md. 2011) (hereafter "*Sherwood Brands*").

4

*no actual prejudice as a result of receiving notice in February 2009 as compared to the November 29, 2008 reporting deadline.*

When the coverage litigation recommenced St. Paul amended its complaint to add a new coverage defense—*i.e.*, that ABHI had breached a contractual "duty to defend" itself and thereby forfeited all rights to coverage because it did not begin its successful defense until after the interlocutory default judgments had been entered. (JA-388; DE-98). After discovery, the parties filed cross-motions for summary judgment. (JA-441; DE-111); (JA-493; DE-117). After reading ABHI's opening brief, St. Paul changed its position on the deadline by which ABHI's notice of claim was due, arguing for the first time in its reply memorandum that ABHI was required to provide notice earlier than November 29, 2008, by some unspecified date that was "as soon as practicable." (JA-567; DE-122 at 9).

The district court granted St. Paul's motion for summary judgment and denied ABHI's cross-motion for partial summary judgment, entering an order declaring that: (1) there is no coverage under the Policy because ABHI acted untimely in responding to the Cueto Action, breaching its "duty to defend" and failing to comply with the notice provision of the policy, causing actual prejudice to St. Paul; (2) St. Paul did not waive any defense to coverage and is not estopped from asserting any defense to coverage; and (3) St. Paul has no liability under

Maryland's statutory cause of action for failing to act in good faith. (JA-707; DE-127).  ABHI timely noted this appeal.  (JA-709; DE-130).

## STATEMENT OF FACTS

### I.    THE ST. PAUL POLICY

St. Paul Policy Number EC03800512 was effective from October 1, 2007 to October 1, 2010 (the "Policy").  (JA-899).  The Named Insured is American Bank Holdings, Inc.  (*Id.*).  This was a renewal of existing coverage, as ABHI had been insured by St. Paul starting in May 1999.  From the beginning of the relationship to the expiration of the Policy in October 2010, St. Paul collected approximately $380,000 in premiums from ABHI and paid $0 in losses.  (JA-1736, 1744). The Policy has multiple Insuring Agreements.  The relevant Insuring Agreement here is Bankers Professional Liability-Lender Liability Coverage, which has a $2,000,000 Limit of Coverage and $50,000 Retention per Policy Year.  (JA-906).

The following is the policy language most relevant to the parties' coverage arguments:

#### Policy Declarations Designating "CLAIMS MADE" Coverage

On the Declarations page the opening paragraph in bold print says:

**IMPORTANT NOTE:  THIS IS CLAIMS MADE COVERAGE. PLEASE READ THIS POLICY CAREFULLY.  This policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.  The Limit of Liability available to pay judgments or settlements shall be reduced and may be exhausted**

6

**by amounts incurred as Defense Costs. The Retentions shall apply to Defense Costs.**

(*Id.*). This bold print warning is set forth at the beginning of each of the Policy's insuring agreements. (JA-932, 935, 938, 940). The term "claims made" can be found in seventeen different places in the St. Paul policy. However, the term "claims made" is not a defined term in the policy other than in the "**IMPORTANT NOTE**" warning that at the top of each Insuring Agreement. (*Compare id.*, *with* JA-916).

<u>Lender Liability Coverage</u>

The Bankers Professional Liability Insuring Agreement for this coverage provides as follows:

**<u>Lender Liability Coverage</u>**

If **Lender Liability Coverage** is granted as set forth in the Declarations, the insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Lending Act, taking place before or during the Policy Period.

(JA-940).

7

<u>Relevant Definitions</u>

"**Policy Period** means the period of time set forth in the Declarations, subject to prior termination in accordance with the Termination of Coverage section."

 "**Policy Year** means:

> (a) the period of one year following the inception date of the Policy Period of  this Policy or any anniversary thereof; . . ."

"**Lending Act** means, only with respect to a loan, lease or extension of credit, any error, misstatement, misleading statement, act, omission, neglect or breach of duty, actually or allegedly committed or attempted by any Insured Person on behalf of the Company, or the Company, in connection with or relating to:

> (a) an agreement or refusal to grant or extend any such loan, lease or extension of credit;
>
> (b) the granting or extending of any such loan, lease or extension of credit; . . ."

"**Claim** means the following, including any appeal therefrom:

> (b) a civil proceeding against any insured commenced by the service of a complaint or similar pleading; . . ."

"**Defense Costs** means that part of Loss consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees, and mediators' or arbitrators' fees) . . . ."

(JA-916).

<u>Duty of the Insureds to Defend</u>

The Declarations include a selection of which entity, St. Paul or ABHI, is

allocated the duty to defend a Claim:

**DUTY TO DEFEND**

| | |
|---|---|
| Management Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Employment Practices Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Fiduciary Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Trust Liability Insuring Agreement: | ☐ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Bankers Professional Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |

(JA-907).

What the "duty to defend" entails and how ABHI was to comply with it are

not specified in the Policy.  The above snapshot of the Policy's duty to defend

allocation reflects only a choice between two options, and does not explain to a

reasonable insured what is expected of it in this regard.  The Defense and

Settlement section of the Policy also is quite vague in allocating to ABHI the duty

to defend:

> If Duty of the Insureds to Defend is selected as set forth in the
> Declarations under an Insuring Agreement made part of this
> Policy, it shall be the duty of the Insureds and not the duty of
> the Insurer to select defense counsel and defend any Claim
> covered by such Insuring Agreement under this Policy.
>
> With respect to any Claim submitted for coverage under such
> Insuring Agreement, the Insurer shall have the right and shall
> be given the opportunity to effectively associate with, and shall
> be consulted in advance by, the Insureds regarding: (a) the
> selection of appropriate defense counsel; (b) substantive

defense strategies, including decisions regarding the filing and
content of substantive motions; and (c) settlement negotiations.

Subject to the Allocation section, the Insurer shall advance, on
behalf of the Insureds, Defense Costs which the Insureds have
incurred in connection with Claims made against them, before
disposition of such claims, provided that to the extent that it is
finally established that any such Defense Costs are not covered
under this Policy, the Insureds, severally according to their
respective interests, agree to repay the Insurer such Defense
Costs.

(JA-926).

Notice

The "Notice" Provision states in relevant part:

The Insureds shall, as a condition precedent to their rights under
this Policy, give to the Insurer written notice of any Claim
made against the Insureds as soon as practicable, but in no
event later than (a) sixty (60) days after expiration of the Policy
Year in which the Claim was first made.

(JA-925).

## II.  THE CLAIM HISTORY

### A.    The Cueto Action

On June 11, 2008 Amiel Cueto filed a *pro se* complaint in the Circuit Court

of the Twentieth Judicial Circuit, St. Clair County, Illinois that set forth fraud and

contract-based claims alleging that twelve defendants fraudulently failed to pay a

loan to the alleged purchaser of the land that Cueto was trying to sell (the "Cueto

10

Action").[2]  (JA-712).  ABHI was a named defendant in the Cueto Action.  (*Id.*).

Although ABHI is not an operating entity and had no connection to the underlying

transaction at issue in the Cueto Action, the complaint implicated the Policy's

Lender Liability Coverage because it alleged a "Lending Act."  (JA-919).

On June 18, 2008, CT Corporation ("CT"), was served with the Cueto suit.

(JA-951).  CT sent the suit papers via Federal Express to John Wright, the former

Chief Financial Officer of ABHI and its banking subsidiary, American Federal

Savings Bank ("American Bank").  (*Id.*).  Mr. Wright had left both companies

some months earlier.  (JA-1755).  The package was sent to 9001 Edmonston Road,

Greenbelt, Maryland 20770, which was the business address of American Bank.

ABHI's business address was 4800 Montgomery Lane, Bethesda, Maryland 20814.

(JA-1258, 1750).[3]

An American Bank employee with no responsibility or training regarding

suit papers received the suit papers and did not forward them to ABHI.  (JA-1261).

For most of 2008, ABHI's only two employees were James Plack, President, and

---

[2]    In this brief, "Cueto Action" means the underlying litigation between Amiel
Cueto and ABHI, including the proceedings in Illinois trial and appellate courts,
and the enforcement proceedings in Maryland, the District of Columbia, Ohio and
North Carolina.  "Cueto Claim" means the claim for insurance coverage that ABHI
made under the St. Paul Policy.

[3]    James Plack, who served as President of ABHI and American Bank, also
had an office at the Greenbelt location, but this was not ABHI's business office.
While John Wright was employed as CFO of American Bank and ABHI, his office
was at the Greenbelt location.  (JA-1752).

11

John Wright, Chief Financial Officer. (JA-1753). Plack and Wright also held the same positions with American Bank. (JA-1748,1752). After Wright moved on to other employment in April, 2008, Plack was ABHI's only employee. (JA-1753). Without Plack's knowledge, the suit papers made their way to Gregory D'Arco, an American Bank employee responsible for mortgage issues. (JA-1620). D'Arco sent the suit papers via email to Richard Fine, an attorney in private practice who performed legal work for American Bank. (JA-1077). It was later discovered that Mr. Fine, who was suffering from cancer and has since died, could not recall receiving the email and, at any rate, took no action with regard to the suit papers. (JA-1357).

Cueto obtained default judgments against ABHI on July 23, 2008, consisting of three orders of default: $7,390,855.10 in compensatory damages, $66,517,695.17 in punitive damages and $24,636,183.65 in attorney fees, for a total of $98,544,733.92. (JA-1064). There is no record of any damages hearing. (JA-1359). Cueto's brother, Lloyd Cueto, was a Judge of the St. Clair County Circuit Court, and had been Chief Judge of the Court. (JA-1771, 1373).

ABHI had no actual knowledge of the Cueto Action until shortly after February 12, 2009, when CT delivered via Federal Express a package containing a copy of the Notice of Filing of Foreign Judgment filed by Cueto in the Circuit Court for Montgomery County, Maryland, which was forwarded to Plack. (JA-

1261, 1756).  ABHI received no information prior to Cueto filing suit that Cueto had any dispute with ABHI, and because it had no connection to the disputed real estate transaction, ABHI had no reason to expect that it would be sued.  (JA-1756).

ABHI promptly alerted its broker, which notified St. Paul on February 25, 2009.  (JA-1143).  The notice to St. Paul on February 25, 2009 was well within the Policy Period, which did not expire until October 1, 2010.  (JA-906).  ABHI sprang into action, filing a comprehensive petition to vacate the default judgments on February 26, 2009, and taking necessary steps to defeat the enforcement actions.  (JA-1146).  The petition demonstrated, among other things, that the Illinois court lacked personal jurisdiction over ABHI.  (*Id.*).  Even when presented with these clearly correct arguments, Judge Andrew Gleeson, who had entered the default judgments, refused to vacate the defaults and found that personal jurisdiction over ABHI existed.  (JA-1272).  On appeal, the Appellate Court of Illinois held as a matter of law that the Illinois courts lacked personal jurisdiction over ABHI.  (JA-1279).

### B.    The Claim Handling by St. Paul

St. Paul received notice of the Cueto Claim on February 25, 2009 from Shannon & Luchs.  The materials that St. Paul received included the June 11, 2008 Cueto Summons and Complaint, the three Judgment Orders dated July 23, 2008, and the enforcement filings in the Maryland state courts.  (JA-1144).

13

After receiving these materials, St. Paul contacted ABHI representatives. While the initial substantive conversation is disputed in some important respects, it is undisputed that St. Paul informed ABHI that its policy required ABHI to defend itself and requested ABHI to keep St. Paul informed of the progress of the defense. (JA-1760 – 1765, 1326, 1826 – 1890). St. Paul claims handlers requested ongoing information, and participated in conferences pertaining to, among other things, the details of the Cueto Action; the choice of defense counsel; the defense strategy; and the defense attorneys' opinions regarding all available defenses. (JA-1826 – 1890).

St. Paul never raised any questions with ABHI regarding the coverage available to ABHI from February 25, 2009 through April 15, 2009. ABHI's general counsel Erik Bolog testified that on February 27, 2009, during his initial telephone call with St. Paul's Chris Nelson, Nelson informed him that the Cueto Claim was covered under the Policy. (JA-1830). Cassandra Wallace, Vice-President of Human Resources for American Bank, also participated in the call and testified that she recalled Nelson stating "there was coverage" for the Cueto Claim, although she could not recall details. (JA-1381). Nelson disputes these recollections of his statements.

Bolog also testified that during a March 16, 2009 telephone call with Nelson, Nelson instructed him to "vigorously defend" the Cueto Action rather than

14

explore settlement.  (JA-1879 – 1882).  Bolog testified that in the same conversation Nelson "admonished" him that ABHI could not settle without St. Paul's consent.  (JA-1886 – 1887).  Bolog testified via affidavit that: "In reliance upon Mr. Nelson's and St. Paul's representations of coverage and instructions to defend against the Cueto claim, ABHI made no attempt to resolve the claim or to seek a settlement."  (JA-1302).

On March 16, 2009, Nelson, who was initially assigned responsibility for the Cueto Claim, sent his supervisor, Theresa Gooley, a draft reservation of rights letter for review, which, if she had approved it, would not have denied coverage to ABHI.  (JA-1219).  The next day Nelson and Mark Gwin, another St. Paul claims handler, did some "Googling" regarding Cueto and found various press articles from which they learned he was a convicted felon, disbarred attorney, had been quoted in a local newspaper as saying he "had all the judges in the [St. Clair] judicial district in his pocket," and had a brother on the bench of the same court.  (JA-1786 – 1797, 1891).  Gooley testified it was likely that Gwin and Nelson shared the results of their "Googling" about Cueto with her and Gwin agreed it is likely he told her that Cueto was a "a disbarred lawyer convicted of a felony who supposedly had a brother on the bench."  (JA-1903, 1796 – 1797).   The next day, Gooley transferred the Cueto Claim file from Nelson to Gwin.  (JA-1902).

On April 15, 2009, Gwin, at the conclusion of a teleconference with Bolog, and after hearing a status report from Bolog about the progress of efforts to vacate the default judgment, announced that St. Paul had decided to deny coverage for the Cueto Claim because ABHI's notice was untimely. (JA-1784, 1889). The same day, Gwin sent a letter to ABHI denying coverage for the Cueto Claim. (JA-1780, 1503).

The April 15, 2009 denial letter stated that the sole basis for the denial of coverage was that ABHI had violated the following "Notice" provision of the Policy:

> The Insureds shall, as condition precedent to their rights under this Policy give to the Insurer written notice of any Claim made against the Insureds as soon as practicable, but in no event later than: (a) sixty (60) days after expiration of the Policy Year in which the Claim was first made . . .

(JA-1504). The denial letter stated that the notice provision required ABHI to give notice of the Cueto Action during the October 1, 2007 to October 1, 2008 "Policy Year", or no later than sixty (60) days after October 1, 2008 (*i.e.*, by November 29, 2008). (*Id.*) The denial letter concluded:

> Clearly, notice was not given to Travelers within the time provided for in the Policy and Travelers therefore must decline coverage on this basis. In addition to the Bank's failure to comply with the Policy's condition precedent to coverage, the Bank's action, or inaction, has prejudiced Travelers.

16

(JA-1505).  The same day that St. Paul sent its denial letter it filed the instant coverage action against ABHI.  (JA-17; DE-1).

### C.    ABHI Defends and Prevails in the Cueto Action.

ABHI hired attorneys at the Bryan Cave law firm in St. Louis, Missouri, just across the border from St. Clair County, Illinois, to pursue overturning the default judgments.  (JA-1818).  The hiring of Bryan Cave was approved by the St. Paul claim handler prior to the April 15, 2009 denial of coverage.  (JA-1813, 1823).  Once the battle moved to the Illinois appellate courts in July of 2009, ABHI replaced the Bryan Cave attorneys with attorneys from the Sidley Austin firm in Chicago, Illinois.  (JA-1814).

ABHI succeeded on August 17, 2009 in having the Montgomery County, Maryland, Circuit Court reject the validity of the St. Clair County default judgments.  (JA-1275).  After extensive proceedings in the Illinois trial court and in the Illinois Fifth District Court of Appeals, ABHI succeeded in obtaining an outright reversal of the default judgments in an appellate decision dated May 15, 2013.  (JA-1279).  That ruling was not appealed.

### SUMMARY OF THE ARGUMENT

St. Paul attempted to justify its refusal to cover ABHI by relying on two technical contract defenses—that ABHI provided untimely notice under the Policy and that ABHI breached its "duty to defend" under the Policy.  Based on

17

undisputed facts, these defenses fail as a matter of Maryland law, and the district court erred by granting summary judgment to St. Paul and denying summary judgment to ABHI.

St. Paul's late notice position was that ABHI forfeited coverage because it provided notice in February 2009 instead of on or before a reporting deadline of November 29, 2008. This argument is legally defective for several primary reasons: (1) ABHI's notice was timely because it was provided promptly after ABHI first learned of the Cueto Action; and (2) St. Paul was not actually prejudiced, as required by Maryland's notice-prejudice statute, because (i) it cannot show its position was any different that it would have been had it received notice by the November 29, 2008 reporting deadline, and (ii) the supposed prejudice St. Paul cites is simply increased defense costs, which Maryland law does not recognize as actual prejudice. St. Paul then impermissibly raised a new late notice theory, inconsistent with its operative complaint, in its summary judgment reply memorandum, now claiming that ABHI was required to provide notice on some unspecified earlier date that was "as soon as practicable." The district court erred in embracing St. Paul's new position, finding that ABHI's notice was untimely and St. Paul was prejudiced as a matter of law.

St. Paul's second defective coverage defense was that, as a matter of law, ABHI breached a contractual "duty to defend" itself when its mistake resulted in

entry of default judgments against it, despite that fact that ABHI obtained a complete victory on appeal. The district court erred in also accepting this argument, which is unsupported by any relevant case law in Maryland or elsewhere. The relevant policy language either compels the conclusion that ABHI complied with the duty to defend provision, or the provision is ambiguous and must be construed against St. Paul as drafter of the policy.

The district court also erred in granting summary judgment to St. Paul despite material disputes of fact regarding ABHI's claims that waiver and estoppel prevent St. Paul from denying coverage, and regarding ABHI's claims that St. Paul failed to act in good faith in violation of Md. Code Ann., Insurance § 27-1001 and Cts. & Jud. Proc. § 3-1701.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion for summary judgment *de novo*, construing all facts and reasonable inferences in favor of the non-moving party. *See Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995). An award of summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986), nor is it appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Overstreet v. Kentucky Cent. Life Ins. Co*., 950 F.2d 931, 937

(4th Cir. 1991).  Where, as here, the district court considered cross motions for

summary judgment, the Court "must review each motion separately on its own

merits to determine whether either of the parties deserves judgment as a matter of

law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation

omitted).  In considering each motion, the Court should "resolve all factual

disputes and any competing, rational inferences in the light most favorable to the

party opposing that motion."  *Id.* (quotation marks omitted).

## ARGUMENT

I.    **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO ST. PAUL, AND DENYING SUMMARY JUDGMENT TO ABHI, AS TO ST. PAUL'S OBLIGATION TO REIMBURSE ABHI FOR THE CUETO ACTION DEFENSE FEES AND COSTS.**

   A.    **The Policy Covers ABHI's Defense Fees and Costs.**

There is no dispute that the Policy covers ABHI's defense fees and expenses

incurred in defending the Cueto Action, which fall within the Insuring Agreement

of the Lender Liability Coverage part of the Policy and the definition of "Loss."

(JA-916).  St. Paul admits that the Cueto Action was filed against ABHI during the

Policy Period.  (JA-386; DE-98).  St. Paul also does not dispute that the Cueto

Action implicated the Policy's Lender Liability Coverage by alleging a "Lending

Act" or that ABHI suffered a "Loss" as a result of the Cueto Action in the form of

"Defense Costs".  (JA-916).  Thus, if this Court rejects St. Paul's asserted technical

20

defenses of late notice and "breach of duty to defend," St. Paul must reimburse ABHI for its "Defense Costs" incurred in the Cueto Action.

**B.     St. Paul's Late Notice Defense Fails as a Matter of Law.**

St. Paul's sole asserted legal basis for denying coverage to ABHI and instituting this declaratory judgment litigation in April, 2009 was its contention that ABHI's notice was untimely under the Notice provision of the Policy.  This position was, and is, wrong on many levels, which can be distilled into two reasons:  *First*, ABHI's notice was not late under the proper construction of the Policy.  *Second*, even assuming *arguendo* that the notice was untimely, Maryland law prohibits St. Paul from denying coverage because St. Paul cannot prove it suffered actual prejudice as a result of ABHI's asserted violation of the Notice provision.  The supposed prejudice St. Paul relied upon was irrelevant because it related to St. Paul's legally defective "duty to defend" argument, not its late notice argument, did not constitute actual prejudice, and was impermissibly speculative.

1.  <u>ABHI's Notice to St. Paul Was Not Late</u>.

St. Paul argued erroneously, and the district court accepted, that because ABHI's registered agent was served with the Cueto Complaint in June, 2008, ABHI was therefore obligated to give notice to St. Paul no later than November 29, 2008.  No Maryland authority supports the proposition that service on a policyholder's registered agent amounts to notice to the insured for purposes of

21

determining the insured's obligation to notify the insurer.  The majority of "late notice" cases involve insureds who were aware of a potential claim, but chose not to notify their carriers.  But what result should apply where the insured has no actual knowledge of a frivolous claim?  Neither the Maryland appellate courts nor this Court have addressed this question.  *E.g.*, *Colleton Preparatory Acad., Inc. v. Hoover Universal*, 616 F.3d 413, 420 (4th Cir. 2010) (declining to examine "whether and under what circumstances an agent's mishandling of process should be charged to a defendant.").

On this issue, *Scottsdale Ins. Co. v. Harris*, 159 F. Supp. 2d 918 (E.D. La. 2001) is instructive.  There, notice was not given to the insurer until after the entry of a default against the insured, and the insurer sought to deny coverage.  As here, the insured did not have actual knowledge of the claim until it learned of the entry of default, but the insurer contended the insured was properly served with the suit.  *Id.* at 920.  The court articulated two bases for rejecting the carrier's position.  First, "it does not necessarily follow that 'service' under California civil procedure is the same as 'notice' under the Scottsdale policy," and there was no indication that the insured was aware it had been sued.  Second, like St. Paul here, the insurer could not refer the court to any language in its policy requiring the insured to forward every summons or other process received by the insured "or his representative."  *Id.*

22

The St. Paul Policy is similarly lacking any language to support an interpretation that constructive rather than actual notice to the insured triggers the obligation to notify the carrier. Absent such language, *Scottsdale* instructs that service of the Cueto complaint on CT, which made its way to American Bank but not to ABHI, did not trigger ABHI's obligation to notify St. Paul. ABHI's obligation to notify St. Paul was not triggered until it had actual knowledge of the Cueto Action, shortly after February 12, 2009. Measured from that time, ABHI's notice was not late.

The Policy is silent on the circumstances that trigger the insured's obligation to notify the carrier. Yet the district court read into the Policy a requirement based on agency principles and the rules of procedure regarding service of process: that *constructive* notice via service of process on the insured's registered agent constitutes *actual* notice for purposes of triggering ABHI's obligation to notify St. Paul of a Claim. (JA-651). The Policy language does not support this interpretation, as it does not state that service of a claim gives rise to the duty to notify St. Paul regardless of whether the insured has actual knowledge of the claim. Indeed, common sense dictates that there can be no obligation to notify St. Paul of a claim until the insured has actual knowledge of it.

Alternatively, the Notice provision is ambiguous in failing to identify the event that triggers the insured's notice obligation in a circumstance where the

insured lacks knowledge of the claim.  This ambiguity is not resolved by reference

to agency law and procedural rules governing service of process.  In the absence of

any extrinsic evidence of mutual intent—which St. Paul did not even attempt to

present to support its interpretation of the Policy—the ambiguity must be resolved

against St. Paul as the drafter of the Policy.  *Empire Fire & Marine Ins. Co. v.

Liberty Mut. Ins. Co*., 699 A.2d 482, 494 (Md. Ct. Spec. App. 1997) ("[I]f an

insurance policy is ambiguous, it will be construed liberally in favor of the insured

and against the insurer *as drafter of the instrument*.") (emphasis in original).  In

view of these ambiguities, ABHI's notice to St. Paul was not untimely, given that

ABHI provided St. Paul notice immediately after learning of the existence of the

Cueto Action.

> 2.  St. Paul Was Required to Demonstrate It Suffered Actual Prejudice
>     <u>Resulting from the Allegedly Late Notice</u>.

As the district court recognized, in *Sherwood Brands*, the Maryland Court of

Appeals held clearly that Md. Code Ann., Ins. § 19-110 requires an insurer to

prove actual prejudice to deny claims-made coverage based on an insured's alleged

failure to give timely notice, whether the policy is a "pure" claims-made policy or

the "claims-made-and-reported" type.  (JA-683).  Indeed, St. Paul did not seriously

contest this point at the summary judgment hearing.  (JA-638).  Thus, even if

ABHI's notice was late, St. Paul was required to provide coverage unless it was

able to prove actual prejudice.

   3.  St. Paul Did Not and Cannot Prove Its Position Is Any Different
       Than If Notice Had Been Provided "Timely" – *i.e.*, by
       <u>November 29, 2008</u>.

The district court erred by accepting St. Paul's conflation of the supposed

prejudice it suffered from ABHI's alleged failure to comply with the "duty to

defend" provision with prejudice supposedly *resulting from ABHI's asserted*

*failure to comply with the Policy's notice requirement*.  (JA-684).  Only the latter

type of prejudice, which is nonexistent here, is relevant to St. Paul's late notice

defense.  Under St. Paul's interpretation of the notice provision, ABHI could have

timely provided notice of the Cueto Action on November 29, 2008, by which time

the default judgments had already been entered.  St. Paul cannot claim it suffered

actual prejudice in the form of the entry of default judgments when compliance

with its own interpretation of timely notice would have led to that same result.[4]

According to St. Paul's "duty to defend" theory, the Policy required that

ABHI, despite having no actual knowledge of the Cueto Action, take actions to

prevent entry of the default judgments that Judge Gleeson improperly entered on

July 23, 2008.  Crucially, the supposed prejudice to St. Paul caused by entry of the

default judgments has nothing to do with any untimely notice under the Policy.

---

[4]    Recognizing this fundamental problem, St. Paul raised a new late notice
theory when it asserted for the first time in its summary judgment reply
memorandum that ABHI was required to give notice at some unspecified earlier
date that was "as soon as practicable."  As discussed below, this was much too late
in the proceedings for St. Paul to concoct a new coverage petition.

Under St. Paul's own interpretation of the Policy's notice requirements ABHI's deadline for reporting the Cueto Claim was "60 days after the Policy Year ended[,]" meaning that that the Policy imposed a "November 29, 2008 deadline for reporting claims first made during that Policy Year[.]" (JA-469; DE-111-1 at 19) (informing ABHI its notice was untimely because it was given after "sixty days following October 1, 2008"); (JA-68; DE-16-1 at 7) ("[T]he Cueto Claim was first made in the Policy Year that expired on October 1, 2008, and the Claim had to be reported to St. Paul no later than November 29, 2008.").

To prove actual prejudice resulting from late notice, St. Paul would have to prove it was placed in a position where it was foreclosed from protecting its interests due to receiving notice *after the deadline imposed by the Policy*. This it cannot do, given that the only source of prejudice St. Paul has ever identified is the entry of the interlocutory default judgments against ABHI, which Cueto obtained on July 23, 2008—more than four months before St. Paul contended ABHI's notice deadline expired. Indeed, through its Rule 30(b)(6) designee regarding coverage positions, St. Paul admitted as much:

> Mr. Stone:  My question is:  Does St. Paul have a position as to whether had notice been provided on November 30, 2008 St. Paul could have somehow accomplished a better result in the Cueto litigation than what ABHI managed on its own?

> [Objection and colloquy among counsel omitted]

> The Witness:  As I understand your question, I – I don't think so.[5]

(JA-1798).

All of St. Paul's prejudice arguments flow from the entry of the default judgments in July, 2008.  Likewise, the district court's prejudice finding also was based solely on the default judgments as opposed to anything that would or could have occurred differently if notice had been provided by November 29, 2008.  (JA-684 – 690).  Thus, the district court erred in finding that St. Paul established actual prejudice in support of its late notice defense, because St. Paul cannot prove actual prejudice *resulting from* the allegedly untimely notice.

### 4.   The District Court Erred in Allowing St. Paul to Reinvent Its Late Notice Theory During Summary Judgment Briefing.

In a transparent attempt to make its prejudice arguments appear relevant, St. Paul advanced a new prejudice theory in its reply memorandum in support of its summary judgment motion, now asserting that the "as soon as practicable" language in the Policy's notice provision—not the November 29, 2008 date—was the operative reporting deadline that ABHI failed to meet, and that ABHI was required to give notice on some unspecified earlier date.  (JA-567; DE-122 at 9).

---

[5]      To be precise, November 29, 2008 is the date that St. Paul contends was the notice deadline, because it was "sixty (60) days after expiration of the Policy Year in which the Claim was first made," *i.e.* sixty days after October 1, 2008. The question to Mr. Gwin assumed incorrectly that November 30, 2008 was sixty days after October 1, 2008, but the one day difference is immaterial.

St. Paul's claim that it had previously asserted this position was demonstrably untrue and belied by a host of St. Paul's prior representations in filings in this case, including its opening summary judgment memorandum and its operative declaratory judgment complaint. *See* (JA-445 & 381; DE-111 & 98).

Maryland law does not allow St. Paul to assert a coverage defense contrary to what is alleged in its operative pleading. *See*, *e.g.*, *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731-32 (4th Cir. 2010) (where amended complaint asserted eight allegations of fraud, additional allegations of fraud could not be raised at summary judgment); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 (4th Cir. 2009) (unpled basis to support defamation claim could not be considered on appeal of award of summary judgment for defamation claim). The district court abused its discretion in concluding that St. Paul had proved prejudice from late notice, relying on a factual finding that the entry of default judgments in Summer of 2008 caused "very, very large legal bills" and ignoring the fact that the default judgments were entered months before expiration of the Policy's 60-day extended reporting period. (JA-690). The district court ignored that if notice had been given on November 29, 2008—the date that St. Paul's denial letter and operative complaint relied on as the reporting deadline—the circumstances would have been the same as when St Paul received notice in February 2009. (JA-1798).

28

5.  St. Paul Presented No Proof of Actual Prejudice as Required by
Maryland Law.

The "evidence" St. Paul presented to support its arguments that it was
prejudiced in the Cueto Action was irrelevant because it was unconnected to its
argument that ABHI violated the Policy's notice provision by failing to provide
notice on or before November 29, 2008.  Rather, St. Paul argued in various
formulations that it was prejudiced because the entry of default judgments in July
2008 created a scenario in which defeating the Cueto Action became more
expensive than it might have been had ABHI timely responded to the complaint.
In ruling from the bench at the summary judgment hearing, the district court
accepted this proposition. (JA-684 – 690) ("So the essential facts that pertain to
both the late notice and the failure to defend are essentially the same set of facts.").

Not only was St. Paul's "evidence" irrelevant to late notice, it did not
concern the type of actual prejudice that Maryland law recognizes as a basis for an
insurer to disclaim coverage.  No Maryland case holds that an insurer can
demonstrate actual prejudice by claiming merely that late notice resulted in a more
expensive defense, and no Maryland case holds that the mere existence of an
interlocutory default judgment constitutes actual prejudice.  Rather, the Maryland
cases focus on whether the insurer lost the ability to affect the *outcome* of the

29

underlying litigation and hold that an insurer has evidence of actual prejudice only if those rights have already been lost when the insurer receives notice.[6]

For example, in *Washington v. Federal Kemper Insurance Co.*, 482 A.2d 503 (Md. Ct. Sp. App. 1984), the court held it was not clearly erroneous for the trial court to find an insurer *was* actually prejudiced when the insurer did not receive notice until after the insureds had suffered a trial verdict and lost their appeal. *Id.* at 507 (notice came after jury returned adverse judgment on the merits, insured appealed, and Court of Special Appeals affirmed the judgment). In language wholly inapplicable to the Cueto Claim, the court stated: "*In such cases where the insurer has been deprived of all opportunity to defend*, the mere entry of the adverse judgment is affirmative evidence of actual prejudice to the insurer." *Id.* (emphasis added). Neither ABHI nor St. Paul was deprived of "all opportunity to defend." Rather, ABHI capitalized on the opportunity to defend by getting the judgments vacated. St. Paul passed on that opportunity.

To the extent courts have found that an insurer lost its opportunity to defend based on the entry of an adverse judgment, those decisions arose from different procedural circumstances in which judgments on the merits were later affirmed by an appellate court. For example, in *Minnesota Lawyers Mut. Inc. Co. v. Baylor &*

---

[6]     Of course, St. Paul faced no such position when it received notice of the Cueto Action; although a large default judgment had been entered, it was clear that the suit was frivolous and the default could and would likely be vacated.

*Jackson, PLLC*, 531 F. App'x. 312, 320 (4th Cir. 2013), "by the time Baylor & Jackson contacted [the insurer], Maryland's Court of Special Appeals had already affirmed the circuit court's grant of summary judgment," so the insurer had no meaningful recourse. Likewise, in *Prince George's County v. Local Government Insurance Trust*, 879 A.2d 81 (Md. 2005) ("*LGIT*"), the county was sued in March 1998 but the insurance trust was not notified until April 2000, after judgment was entered against the county following a federal jury trial (which was thereafter affirmed on appeal). The *LGIT* Court stressed that "by failing to notify the Trust of the incident, claim, and lawsuit until after the judgment, the County nullified unilaterally all of the Trust's rights and presented the Trust with a *fait accompli*." *Id.* at 100. These cases do not support the proposition that the mere entry of interlocutory default judgments constitute *per se* actual prejudice.

The question is more nuanced, and requires an analysis of the specific facts and circumstances, which the district court failed to perform. *Cf. McDowell Bldg., LLC v. Zurich Am. Ins. Co.*, Case No. 12-2876, 2015 U.S. Dist. LEXIS 60350, *17 (D. Md. May 7, 2015) ("In order to establish actual prejudice, the insurer must demonstrate that the insured's actions have in a significant way . . . precluded or hampered [the insurer] from presenting a credible defense to the claim. On the other hand, [a]lleging only possible, theoretical, conjectural, or hypothetical prejudice is not enough to satisfy 19-110; prejudice cannot be surmised or

31

presumed from the mere fact of delay.") (quotations omitted) (alterations and ellipses in original).

The Maryland Court of Appeals' opinion in *Allstate Ins. Co. v. State Farm Auto Ins. Co.* illustrates the rigor with which a court must evaluate the "the very different circumstances, and thus the very different kinds of prejudice, that can be presented by breaches of these [notice and cooperation] provisions." 767 A.2d 831, 841 (2001).[7]  Analyzing decisions from Maryland and other jurisdictions, the Court noted that prior "attempts at devising a standard for determining actual prejudice in failure of notice or cooperation cases had been problematic," and observed that "[i]t is very difficult to fashion a workable 'one size fits all' standard." *Id.*   The court then made a series of observations that illuminate when and how an insurer might (or might not) be prejudiced by an alleged late notice or failure to cooperate:

- If an insurer is not given prompt notice of the accident or of the claim, it may (or may not) lose the ability to discover relevant evidence, particularly the identity of witnesses and their contemporaneous recollections.

---

[7]    In *Allstate*, the insurer declined coverage based on the insured's failure to cooperate in the defense of a claim under an automobile insurance policy.  The Court of Appeals granted certiorari to consider "the correct legal standard for determining the actual prejudice that an insurer must establish under § 19-110 of the Insurance Article in order to disclaim coverage by reason of an insured's failure to cooperate." *Id.* at 838.  Although *Allstate* is not a late notice case, the Court's discussion of § 19-110 sheds light on the statute's actual prejudice requirement.

- [W]hether that lost opportunity results in prejudice cannot really be known, if at all, until after trial and verdict in the tort action.

- Even then, there may be a considerable element of speculation involved in attempting to measure whether there was actual prejudice to the insurer:

    o was there any other relevant and credible evidence to be discovered;

    o what efforts did the insurer make, after notice, to discover that information and develop a defense; and

    o how credible would any such information have been had it been discovered and presented?

*Id.* (formatting altered).[8]

Comparing these questions with the specific facts and circumstances of this case, it is clear that the district court erred in finding actual prejudice as a matter of law. First, the timing of ABHI's notice did not cause St. Paul to "lose the ability to discover relevant evidence." Here, the relevant evidence centered on ABHI's lack of a relationship with Cueto and the Illinois court's lack of personal

---

[8]    Based on these observations, the court articulated the standard for determining actual prejudice in a duty to cooperate case as follows: "[W]hether the insured's willful conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded." *Id.* at 843. The timing of ABHI's notice *did not* prevent St. Paul from establishing "a legitimate jury issue of [its] liability," because ABHI's successful personal jurisdiction defense resulted in the judgments being vacated and the suit being dismissed as against ABHI. In the end, no jury ever heard Cueto's claims against ABHI.

33

jurisdiction over ABHI. (JA-1147). The two witnesses with information on those issues, ABHI's President Jim Plack and Cueto himself, were identified and available to St. Paul when ABHI provided notice in February of 2009, yet St. Paul failed to even attempt to undertake an investigation or to develop a defense after receiving notice, opting instead to rest on a late notice technicality. Having foregone the opportunity to investigate and assist ABHI in its defense of the Cueto Action, St. Paul cannot credibly claim that it was actually prejudiced by the timing of ABHI's notice. Finally, notably absent from the *Allstate* Court's observations is any discussion of increased legal fees, which are often an issue where an insured refuses to cooperate with the insurer. Potentially increased legal fees are not relevant to the actual prejudice inquiry as developed by Maryland's appellate courts or as applied by federal courts in the District of Maryland.

To be sure, large default judgments had been entered against ABHI when it learned of the Cueto Action and provided notice to St. Paul. But St. Paul had not lost the ability to attack the judgments, either factually or procedurally. This should have been the district court's focus under Maryland's notice-prejudice cases. Instead, the district court accepted St. Paul's erroneous argument that a large legal bill was *per se* prejudice.

Unlike the insurers in the cases St. Paul relied on, St. Paul did not face a *fait accompli* and did not lose its right to monitor, advise and oversee the successful

post-default defense of the Cueto Action; it simply opted to "bail out" and rely on a technical defense.  There is no authority for St. Paul's theory, which is that the existence of a legally defective, interlocutory default judgment entered as to a frivolous claim against its insured constitutes actual prejudice under Maryland law.

Indeed, the only case cited by St. Paul which involved a default judgment makes this clear.  In *Woodfin Equities Corp. v. Harford Mutual Ins. Co.*, 678 A.2d 116 (Md. Ct. Spec. App.), *rev'd in part on other grounds*, 687 A.2d 652 (Md. 1997), Harford did not receive notice for more than four years after the underlying suit was filed and more than two years following entry of a default judgment against its insured.  Still, the circuit court in the coverage action rejected the insurer's argument that it suffered prejudice as a matter of law.  The Court of Special Appeals affirmed that holding, noting that the insurer had the opportunity to jointly petition with the underlying plaintiff to vacate the default judgment, but instead "chose to rest on the technical defense of lack of cooperation and notification."  *Id.* at 136.  Because Harford had the opportunity for "significant post-judgment control" of the litigation, the court rejected its actual prejudice argument, noting that the prejudice issue could be decided at trial on remand. The Court of Appeals then partially reversed the intermediate court but adopted its prejudice analysis, holding: "For the reasons delineated in the opinion of the Court

of Special Appeals, we agree the circuit court did not err in finding that Harford

suffered no prejudice by an alleged lack of timely notice." 687 A.2d at 657.

Under the *Woodfin* analysis, St. Paul did not suffer actual prejudice

(certainly not as a matter of law) when it decided to rest on a technical defense

rather than exercise its opportunity to exert "significant post-judgment control" of

the Cueto Action in a posture that suggested a favorable outcome. Both St. Paul

here and Harford in *Woodfin* could have supported their insured by fighting the

default judgment. "Rather than at least attempting such a course of action,

[Harford] chose to rest on the technical defense of lack of cooperation and

notification." This, the Court held, did not constitute actual prejudice. 678 A.2d at

136.

In addition to the mere fact of the entry of a default judgment, Harford

claimed further prejudice because the late notice extinguished its ability to

investigate the claim. A representative of the insured testified that, although he

once knew their identity and location, he could not identify any employees who

might have been key witnesses. Harford further speculated that even if those

employees could be located, their "memories have surely faded." But Harford's

claims manager testified at trial that Harford Mutual "undertook no investigation"

of the insured's claim beyond reviewing the complaint. *Id.* at 136. (Similarly, St.

Paul performed no investigation of the Cueto Claim prior to disclaiming

36

coverage.).  (JA-1385, 1387).  In light of this admission, the Court of Special

Appeals found the claim of actual prejudice based on inability to investigate

lacking: "An insurer cannot assert prejudice with regard to its ability to conduct an

investigation that it never tried to conduct."  *Id.* (citing *General Accident Ins. Co.*

*v. Scott*, 669 A.2d 773 (Md. 1996)).

Absent from the record is any evidence indicating how St. Paul was *in fact*

prejudiced by the delayed notice.  For example, there is no suggestion that St. Paul:

- is liable for paying any judgment or settlement under the Policy;

- lacked sufficient opportunity to investigate the claim;

- lacked the opportunity to negotiate a settlement.

Indeed, ABHI's successful defense of the Cueto Action and enforcement

actions rescued St. Paul from the first scenario, and St. Paul voluntarily declined to

pursue investigation and settlement.  *See Scott*, 669 A.2d at 780 ("It is also

important to our analysis that, although [insurer] claims that it could not investigate

the scene of the accident, it makes no claim that it ever attempted to investigate the

accident or that important evidence disappeared.  Nor does [insurer] identify with

any particularity what material evidence is unavailable or how it was actually

prejudiced as a result.").  Other than fulfill its contractual obligations and pay

ABHI's defense costs, there is nothing St. Paul could have done to achieve a better

result.

Finally, the "evidence" that St. Paul offered to prove its prejudice was inadmissible conjecture presented by its proposed expert witness, attorney Timothy Richards. (JA-1476). This is not competent evidence and the district court should have rejected it entirely instead of relying on it to support the conclusion that the Cueto Action was vastly more expensive to defend as a result of the default judgments.[9] For example, Mr. Richards speculated in his expert report that "ABHI likely would have been voluntarily dismissed [by Cueto] had it timely defended[,]" because Cueto had voluntarily dismissed one of Mr. Richards' clients in another case, and because "[i]t is also possible that one of the other defendants might not have timely responded," in which case Cueto could have defaulted that defendant and dismissed ABHI. (JA-1482). Mr. Richards also opined that if ABHI had initially raised its personal jurisdiction defense in a "standalone motion," as opposed to including it with other arguments in its petition to vacate the defaults, Judge Gleeson would likely have granted the motion because the latter approach

---

[9]     *See*, *e.g.*, *Dash v. Mayweather*, 731 F.3d 303, 321 (4th Cir. 2013) (in affirming grant of summary judgment, noting that an expert report that lacks an explanation of "the factual basis and the process of reasoning which makes the conclusion viable . . . will be insufficient to rebut a properly supported motion for summary judgment.") (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."); *accord New York State Ophthalmological Soc. v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations.") (quotation omitted).

"likely had the effect of complicating, and therefore potentially compromising, the efforts of conscientious judicial decisionmaking."  (JA-1480).

This is rank speculation to begin with, made more incredible by the suggestion that Judge Gleeson would have engaged in "conscientious judicial decisionmaking" when in fact he entered default judgments in the amount of $98 Million without a damages hearing, including an award of $66,517,695.17 in punitive damages and $24,636,183.65 in attorney fees,[10] and then rejected ABHI's clearly correct personal jurisdiction defense when presented to him in the petition to vacate the default.  Mr. Richards also opined that Judge Gleeson would have probably granted a motion for summary judgment filed by ABHI based on ABHI's lack of involvement in the underlying real estate transactions, in part because under this scenario Richards assumed there would have been "potentially viable co-defendants" and this would have made Judge Gleeson more comfortable with letting ABHI out of the case.  (JA-1481).

Given Judge Gleeson's bizarre rulings in Cueto's favor, no one can say with any reasonable basis how he would have ruled on motions that ABHI could have

---

[10]     Cueto was a *pro se* plaintiff and incurred no attorneys' fees.

filed at an earlier time if it had known of the Cueto Action.[11]  Thus, Richards also

guessed impermissibly when he opined that if ABHI had acted "timely" it would

have likely obtained a favorable outcome at a cost of under $100,000, and would

not have ultimately been faced with a large judgment requiring the defense of

judgment enforcement actions.  (JA-1483).

The district court erred in accepting as undisputed fact the notion that "any

competent counsel could have come in and . . . had the case promptly dismissed for

relatively minor cost to [ABHI]."  (JA-687).

### C.    St. Paul's Breach of Duty to Defend Theory Fails as a Matter of Law.

Considering the weakness of its late notice defense, especially after the 2011

*Sherwood Brands* decision, it seems clear that St. Paul raised the "breach of duty to

defend" coverage defense when it filed its Amended Complaint in January, 2014 as

an attempt to circumvent Maryland's actual prejudice requirement for late notice

defenses.  Indeed, St. Paul's counsel essentially conceded as much at the summary

---

[11]    Mr. Richards' deposition testimony only reinforced the conclusion that his opinions were speculation.  He testified that Amiel Cueto's brother, Lloyd Cueto, had been Chief Judge of the St. Clair County Circuit Court for a long period of time.  (JA-1373).  He agreed that St. Clair County has been characterized in media accounts as a "corrupt legal environment," has "ranked high" for at least the last decade in national rankings of "judicial hell holes[,]" and has garnered media attention as being "very plaintiff friendly."  (JA-1377).  This reinforces the conclusion that no one can predict how ABHI would have fared in the Cueto Action, with this particular judge and this unusual plaintiff, in this jurisdiction, even had it filed a speedy response to Cueto's complaint.  Normal rules simply did not apply in this particular "judicial hell hole."

judgment hearing, stating that after *Sherwood Brands* issued, "we are looking to our other coverage defenses and applying them…." (JA-638).

Yet the duty to defend argument has no merit. Its weakness is underlined by several facts. St. Paul did not even mention a breach of "duty to defend" in its denial of coverage letter to ABHI, or in any conversations with ABHI. (JA-1251). St. Paul claims supervisor Theresa Gooley's "claim synopsis" that she entered in the claim file on April 2, 2009, said nothing about any breach of a duty to defend, stating simply: "There does not appear to be coverage because the insured failed to provide us with timely notice." (JA-1908). She admits this was an accurate reflection of her understanding at the time.[12] (JA-1906). Despite being represented by experienced insurance coverage counsel, St. Paul also did not include this defense in its original Complaint for Declaratory Judgment in this case. (JA-17; DE-1). St. Paul claim counsel Mark Gwin, testifying as a Rule 30(b)(6) witness, agreed that as a general matter, an insurer that denies coverage and files a declaratory judgment action against its insured should include in its complaint any coverage defenses of which the insurer is aware. (JA-1777). It is telling that apparently no one at St. Paul even thought of asserting a breach of duty

---

[12] Theresa Gooley was a Claim Director at St. Paul Travelers responsible for overseeing all errors and omissions claims, D&O claims, and financial institution bond claims involving financial institutions. (JA-1897). She was responsible for managing the Cueto Claim and supervised Chris Nelson and then Mark Gwin with respect to the claim. (JA-1902).

to defend argument before denying coverage and initiating coverage litigation, despite the fact that St. Paul was in possession of all relevant facts at the time.[13]

Not surprisingly, St. Paul is able to cite no apposite case law in support of its duty to defend argument, despite searching nationwide for such authority. This absence of authority suggests that the Maryland Court of Appeals would be hesitant to accept a technical defense that would undermine the policy embodied in Ins. § 19-110.

The only decision St. Paul cited in which a policyholder was denied coverage for failing to defend itself, *Heil Co. v. Evanston Ins. Co.*, No. 1:05-cv-284, 2009 WL 596001 (E.D. Tenn. Mar. 6, 2009) is both unpublished and wholly distinguishable. In *Heil*, Evanston's coverage obligations to its insured were subject to a $500,000 self-insured retention provision (SIR), which provided:

- "Compliance with this clause is a condition precedent for coverage under this policy. In the event of the failure of the Insured [Heil] to comply with this clause, no loss, cost or expense shall be payable by the Company [Evanston]." *Id.* at *2; and

---

[13] It is also revealing that none of the St. Paul witnesses who were deposed in this case—all experienced professionals in the liability insurance industry—has ever heard of St. Paul, or any insurer, denying coverage based on the argument that the insured breached a duty to defend itself. *E.g.*, (JA-1742) (In 27 years working for various insurers, St. Paul underwriter J. Michael Husbands could not recall any insurer he worked for, or any insurer, denying a claim based on a contention that the insured breached a duty to defend).

- "The Insured shall have the obligation to provide, at his own expense, *proper defense and investigation* of any claim and to accept any reasonable offer of settlement within the Self-Insured Retention." *Id.* (emphasis added).

Thus, Evanston's defense and indemnity obligations were nonexistent unless the insured complied with these specific obligations and exhausted the SIR. Despite having prompt knowledge of the underlying claim and hiring a defense attorney, the insured failed to answer the complaint or respond to discovery requests in the underlying wrongful death action, resulting in entry of a $4 Million default judgment. *Id.* at *3.

Unlike ABHI in the Cueto Action, Heil was unable to set aside the default, so it settled the lawsuit and demanded indemnity payment from the insurer—not reimbursement for defense costs. After Heil missed two briefing deadlines in the coverage litigation, causing the court to reject its summary judgment opposition, the court ruled in favor of the insurer. *Id.* at *1 n.2. The court held Evanston had no duty to indemnify because the SIR presented condition precedents to coverage—that the insured provide a "proper defense and investigation" and accept "any reasonable offer of settlement,"—which demonstrated that "the clear intention of the parties was to hold Heil's duty to defend to a standard of reasonableness[,]" which Heil breached. *Id.* at *4. By contrast, unlike the SIR provision in the Evanston policy, the St. Paul Policy does not make compliance with the duty of the insured to defend a condition precedent to coverage, nor does

43

it include any temporal or qualitative requirements for the insureds' defense.  Thus,

regardless of whether or not the *Heil* decision was correctly decided under

Tennessee law, the decision is irrelevant to St. Paul's coverage obligations in this

case.

St. Paul also cited *Delatorre v. Safeway Ins. Co.*, 989 N.E.2d 268 (Ill. App.

Ct. 2013), which did not even involve an insured's duty to defend itself and

actually supports ABHI's position.  *Delatorre* involved an automobile liability

insurer that was found to have breached a contractual duty to defend its insured,

where the insurer's retained defense counsel did nothing on the case, the insurer

negligently failed to ensure a defense was provided, a default judgment was

entered against the insured, damages were proved at an evidentiary hearing, and

the insured settled by assigning his rights to the plaintiff. *Id.* at 269-75.   Not only

is that decision inapposite because it involved an insurer's breach of its duty to

defend its insured (which implicates quite different contractual and public policy

considerations than the issues here), but the court's holding was that the insurer

breached its duty to defend by not requiring assigned counsel to defend the insured

*after being notified that default had been entered*.  The court even summarized the

holding it affirmed by stating the trial court found the insurer "took insufficient

action *on learning that [the insured] had been defaulted* …[,]" and emphasized:

"In our view, an insurer's promise to defend entitles the insured to expect that its

44

insurer will retain an attorney *who will in fact take action to defend the insured in the face of a default order*."  989 N.E.2d at 269 (emphasis added).  In *Delatorre*, the insurer caused the ultimate injury to its insured by abandoning it after default was entered; here, ABHI avoided such consequences by defending itself and overturning the default judgment even after being abandoned by St. Paul.

Here, the duty to defend allocation does not explain *what* ABHI was required to do or *when* ABHI was required to do it.  The district court apparently drew from its experience in coverage litigation and read into the Policy that ABHI's duty to defend was the mirror-image of an insurer's duty to defend in an occurrence policy.  (JA-685) ("The usual case is an occurrence policy, and the insurer has the exclusive right to control the defense of the action, select counsel and so forth. . . .  But this policy is exactly the opposite and has a duty to defend that rests upon the insured, not the insurer.").  There is no language in the Policy to support this interpretation of the "duty to defend," nor is there any extrinsic evidence in the record to that effect. The district court's analogy was also flawed in that the Policy *does not* give ABHI "the exclusive right to control the defense of the action, select counsel and so forth." (JA-926).  Rather, it reserves key rights to St. Paul to "effectively associate with, and [to] be consulted in advance" throughout ABHI's fulfillment of its duty to defend.  (*Id.*).  The district court erred

45

in drawing a false equivalency between an insurer's duty to defend and ABHI's "duty to defend" under the Policy.

More important than the lack of any legal authorities supporting St. Paul's duty to defend argument is the fundamental, undisputed fact that ABHI *did* defend itself in the Cueto Action, and *prevailed*. The policy language that St. Paul contends ABHI violated states simply:

> If Duty of the Insureds to Defend is selected as set forth in the Declarations . . . it shall be the duty of the Insureds and not the duty of the Insurer to select defense counsel and defend any Claim covered by such Insuring Agreement under this Policy.

(JA-926). There is no evidence that ABHI violated this provision; rather, the evidence shows ABHI complied with it. There is no dispute that as soon as ABHI learned of the Cueto Action it selected counsel and mounted a vigorous defense of the claim, which resulted in a complete victory on appeal.

The Policy is silent on what else, if anything, an insured must do to satisfy its "duty to defend." The district court recognized this in observing that "I do not find anything significant in the language of the policy that talks about the duty to defend, meaning do so as soon as practicable." (JA-688). A reasonable interpretation of the duty to defend obligation is that, once ABHI learns of a claim, it must retain counsel and take reasonable actions necessary to avoid liability, which ABHI did. In contrast, the district court concluded that "it clearly means one initiates defense measures that are undertaken and accomplished before a

46

default can be entered," despite the absence of any Policy language to that effect. (*Id.*). At best, then, there is an ambiguity in the Policy language not clarified by extrinsic evidence, which when construed against St. Paul, as drafter of the policy, is fatal to St. Paul's coverage defense.

Even if St. Paul could establish that ABHI breached the duty to defend provision, it could not avoid its coverage obligations without proving actual prejudice. St. Paul's duty to defend defense is essentially a repackaging of its late notice defense combined with lack of cooperation allegations. Given the strong Maryland public policy of protecting insureds from forfeiting liability coverage based on such technical defenses as late notice and lack of cooperation in the absence of actual prejudice to the insurer, it is inconceivable that Maryland law would allow St. Paul to use its invented duty to defend theory to circumvent the prejudice requirement. *See Sherwood Brands*, 13 A.3d at 1274-75 (explaining enactment and public policy rationale of Ins. § 19-110).

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO ST. PAUL DESPITE KEY DISPUTES OF MATERIAL FACT.

St. Paul's coverage defenses fail as a matter of law. Beyond that, as to Count I of ABHI's Counterclaim, there are material disputes of fact regarding whether St. Paul waived or is estopped from asserting its late notice and "duty to defend" defenses to coverage. As to Count II, in which ABHI asserts a statutory lack of good faith claim, the testimony of St. Paul's claims handlers and the

affidavit of ABHI's expert witness John Moyer are sufficient to require a trial of those claims.

**A.    ABHI's Waiver and Estoppel Defenses, Which Turn on Disputed Material Facts, Made Summary Judgment Inappropriate.**

"Whether waiver exists in a given case is normally a question for the trier of fact." *St. Paul Fire & Marine Ins. Co. v. Molloy*, 433 A.2d 1135, 1138 (Md. 1981). "Similarly, the question of estoppel is frequently a fact question because it involves the assessment of conduct by one party and reliance by another party." *Allstate Ins. Co. v. Reliance Ins. Co.*, 786 A.2d 27, 33 (Md. 2001). The evidence regarding ABHI's waiver and estoppel arguments present quintessential disputes of fact that precluded the entry of summary judgment in St. Paul's favor on ABHI's Counterclaim. To resolve the dispute, a jury must be allowed to evaluate the parties' conflicting versions of events in the first days and weeks after ABHI and St. Paul learned of the Cueto Action.

ABHI general counsel Erik Bolog testified in deposition that St. Paul's Chris Nelson stated in their February 27, 2009 phone call that St. Paul would provide coverage for the Cueto Claim. (JA-1830, 1848, 1863). ABHI has consistently maintained that it relied on this representation in deciding to continue litigating the Cueto Action, whereas it would have pursued early settlement if St. Paul had instead declined coverage. (JA-1317; JA-1302). While St. Paul attempted to discredit Bolog's recollection of the telephone conversation in question as

48

"factually unsupported," Bolog's testimony is competent evidence. At the summary judgment stage, however, the court's role was not to "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The dispute here reinforces the general rule in Maryland that whether waiver exists in a given case is a question for the trier of fact and cannot be determined on motion. *Ins. Co. of N. Am. v. Coffman*, 451 A.2d 952, 956 (Md. Ct. Spec. App. 1982); *St. Paul Fire & Marine Ins.*, 433 A.2d at 1138.

At his deposition Bolog made several key assertions that directly support ABHI's waiver and estoppel arguments:

- That Chris Nelson told him on their February 27, 2009 phone call that St. Paul would provide coverage to ABHI for the Cueto Claim. (JA-1830, 1848, 1863).

- That Nelson told him during a March 16, 2009 phone call not to pursue settlement with Mr. Cueto. (JA-1882, 1884).

- That Nelson told him ABHI could not pursue a settlement with Mr. Cueto without St. Paul's consent. (JA-1883).

- That, given St. Paul's assurance of coverage and direction not to pursue settlement, ABHI instructed its attorneys to institute a vigorous defense of the Cueto Claim and enforcement actions (JA-1882, 1884).

49

The effect of St. Paul's representations of coverage was profound. ABHI relied on and acted in accordance with those representations in defending the Cueto Action. Had Chris Nelson not given assurances of coverage and instructions to "vigorously defend," ABHI would have taken a different course. In responding to an Interrogatory that asked for details regarding how ABHI relied to its detriment on Nelson's representation of coverage, ABHI responded in part:

> If [ABHI] had known that St. Paul had decided to deny coverage and that St. Paul would not reimburse ABHI for its defense costs, ABHI would have immediately sought to negotiate a settlement with Cueto, sought early mediation or otherwise attempted to resolve the matter at the outset, before incurring hundreds of thousands of dollars in legal fees.

(JA-1317). That response is consistent with Mr. Bolog's Affidavit, in which he stated: "In reliance upon Mr. Nelson's and St. Paul's representations of coverage and instructions to defend against the Cueto claim, ABHI made no attempt to resolve the claim or to seek a settlement." (JA-1302).

This evidence creates a genuine dispute of material fact that a jury must be allowed resolve. The district court simply ignored, or impermissibly chose not to credit, this evidence in rejecting the waiver and estoppel defenses as a matter of law by concluding there was "no evidence in this summary judgment record" of "any change in position in reliance [upon St. Paul's statement that the claim was covered] or any prejudice to [ABHI] to the extent that I credit the notion that somebody said you're covered and then changed their mind." (JA-690).

50

A carrier will be estopped from denying liability if it fails to make a timely disclaimer. *Maynard*, 208 F. Supp. 2d at 576; *Med. Mut. Liability Ins. Soc. of Maryland v. Miller*, 451 A.2d 930, 956 (Md. Ct. Spec. App. 1982). And where, prior to issuing a reservation of rights or disclaimer, an insurer assumes the defense of its insured with actual or presumed knowledge of facts that would have permitted it to deny coverage, the insurer will be estopped from later raising non-coverage as an affirmative defense. *See Hartford Ins. Co. v. Annapolis Bay Charters*, 69 F. Supp. 2d 756, 763-64 (D. Md. 1999). With respect to late notice, the disputed facts presented above preclude the entry of summary judgment in St. Paul's favor. As to the "duty to defend" provision, there can be no dispute: St. Paul waited months to offer this justification for its improper denial of coverage, and then only as a defense buried in its Answer to ABHI's Counterclaim. (JA-264; DE-31). St. Paul is estopped from asserting the "duty to defend" theory to deny coverage. *See*, *e.g.*, *Annapolis Bay Charters*, 69 F. Supp. 2d at 763-764 (where insured alleged detrimental reliance on the carrier's representation of coverage, whether the insured in fact sustained actual harm was a question of fact for trial).

### B.    Abundant Evidence, Both Undisputed and Disputed, Demonstrates St. Paul's Lack of Good Faith in Handling the Cueto Claim and Precluded Entry of Summary Judgment in St. Paul's Favor on ABHI's Statutory Claim.

The Maryland legislature created a statutory cause of action for policyholders against insurers that fail to act in good faith with respect to an

insurance claim.  Md. Code Ann., Ins. § 27-1001; Cts. & Jud. Proc. § 3-1701.

Where the insurer has failed to act in good faith, the policyholder may recover

enhanced damages including its attorney's fees.  "Good faith" is defined as making

"an informed judgment based on honesty and diligence supported by the evidence

the insurer knew or should have known at the time the insurer made a decision on

the claim."  Cts. & Jud. Proc. § 3-1701(a)(4).  Evidence uncovered in discovery in

this litigation, concerning both undisputed facts and disputed facts, demonstrates

that St. Paul fell far short of this standard in handling the Cueto Claim.  Certainly,

a reasonable jury could so conclude by resolving the disputed facts and reasonable

inferences therefrom in ABHI's favor.  Thus, it was error for the district court to

award St. Paul summary judgment.

As demonstrated above, St. Paul's decision to deny ABHI coverage for the

Cueto Claim was wrong under Maryland law.  And, contrary to St. Paul's

suggestion, an insurer is not shielded from liability for lack of good faith by

showing the disputed claim is "fairly debatable."  *Cecilia Schwaber Trust Two v.*

*Hartford Acc. & Indem. Co.*, 636 F. Supp. 2d 481, 486-87 (D. Md. 2009).  As

Judge Frederick Motz wrote in *Cecilia Schwaber*:

> An evaluation of whether an insurer made an 'informed
> judgment based on honesty and diligence supported by
> evidence the insurer knew or should have known at the time' of
> its coverage decision requires, for example, *an evaluation of the*
> *insurer's efforts to obtain information related to the loss,*
> *accurately and honestly assess this information, and support its*

> *conclusion regarding coverage with evidence obtained or
> reasonably available. The fairly debatable standard should not
> be glossed onto the standard explicitly created by the Maryland
> legislature.*

*Id.* at 487 (emphasis added). As Judge James Bredar recently summarized, Judge

Motz in *Cecilia Schwaber* adopted a "totality of the circumstances" standard for

analyzing a statutory claim for lack of good faith, which includes three factors:

> [(1)] efforts or measures taken by the insurer to resolve the
> coverage dispute promptly or in such a way as to limit any
> potential prejudice to the insureds; [(2)] the substance of the
> coverage dispute or the weight of legal authority on the
> coverage issue; [and] [(3)] the insurer's diligence and
> thoroughness in investigating the facts specifically pertinent to
> coverage.

*All Class Const., LLC v. Mutual Ben. Ins. Co.*, 3 F. Supp. 3d 409, 416 (D. Md.

2014) (quoting *Cecilia Schwaber*, 636 F. Supp. 2d at 486-87); *see also Millenium*

*Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins.*, 893 F. Supp. 2d 715, 740-41

(D. Md. 2012), *rev'd and remanded on other grounds*, 744 F.3d 279 (4th Cir.

2014) (agreeing with "totality of the circumstances" standard).

St. Paul failed all prongs of these standards. St. Paul made no effort to

resolve the coverage issues quickly, to limit prejudice to ABHI, or to investigate

the facts of the underlying claim or ABHI's claim for coverage. According to Erik

Bolog, Chris Nelson assured him the Cueto Claim was covered and discouraged

him from seeking an early settlement of the claim. *See supra* Section II(A). St.

Paul did not send ABHI a reservation of rights letter or otherwise raise *any*

53

coverage concerns with ABHI for over seven weeks—between February 25, 2009 and April 15, 2009, the day that St. Paul sued ABHI and informed it that coverage was denied.  (JA-1889; 1811).  St. Paul performed *no* factual investigation of the Cueto Claim beyond review of the pleadings and a few brief telephone calls with ABHI representatives.  (JA-1385; 1387).

It is undisputed that on March 16, 2009, Chris Nelson sent his supervisor, Theresa Gooley, a draft reservation of rights letter addressed to ABHI for her review and approval, which would not have denied coverage.  (JA-1219).  The next day, Nelson and Gwin did some "Googling" regarding Cueto and found press articles from which they learned he was a convicted felon and disbarred attorney, had been quoted in a local newspaper as saying he "had all the judges in the St. Clair judicial district in his pocket," and had a brother on the bench of the same court in which he had obtained over $98 Million in default judgments under very suspicious circumstances.  (JA-1786 – 1797, 1891).  Gwin and Nelson shared the results of their "Googling" about Cueto with Gooley, and Gwin agreed it is likely he told her that Cueto was "a disbarred lawyer convicted of a felony who supposedly had a brother on the bench." (JA-1903, 1796 – 1797).   The next day, Gooley took Nelson off the Cueto Claim file and transferred it to Gwin.  (JA-1902).

Gwin and Gooley understood that St. Paul faced exposure up to its policy limit of $2 Million for the Cueto Claim if they did not deny coverage, yet St. Paul gave no consideration to the extreme adverse consequences a denial of coverage could cause for ABHI, including the trouble that the denial could cause ABHI with banking regulators.  (JA-1801; 1904).  In their eagerness for St. Paul to escape any obligations for the Cueto Claim, the claims handlers made no investigation or determination, and to this day St. Paul cannot demonstrate, that St. Paul suffered any actual prejudice as a result of ABHI providing notice on February 25, 2009.

Far from seeking to limit prejudice to ABHI from the denial of coverage, St. Paul also ignored its clear obligation to advance ABHI's Cueto Claim Defense Costs pending final resolution of the coverage issues by this Court, as required by the Policy's advancement of costs provision, which provides in relevant part:

> [T]he Insurer shall advance, on behalf of the Insureds, Defense Costs which the Insureds have incurred in connection with Claims made against them, *before disposition of such claims*, provided that to the extent that it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their respective interests, agree to repay the Insurer such Defense Costs.

(JA-926).  St. Paul's nonsensical answer to this is that the duty to advance defense costs does not apply when St. Paul unilaterally decides the claim is not covered. (JA-1804 – 1810).  St. Paul's interpretation is flatly inconsistent with the

55

provision's requirement that the insured must repay the advanced funds if it is "finally established" that Defense Costs are not covered. (JA-926).

As for the "weight of legal authority" factor, St. Paul's position that Maryland law allowed it to deny coverage, with no showing of prejudice, was quite dubious even before the Maryland Court of Appeals decided *Sherwood Brands*. As *Sherwood Brands* reflects, Maryland law in 2009 was that an insurer cannot deny coverage based on late notice without demonstrating actual prejudice, regardless of whether the policy is considered pure "claims-made" or the "claims made-and-reported" variety. 13 A.3d at 1288. *Sherwood Brands* simply put the final nail in the coffin of St. Paul's notice defense.

In addition to all of these facts, the district court should have considered the opinions of John D. Moyer, ABHI's expert regarding the insurance industry's generally accepted claims handling practices and regarding St. Paul's handling of the Cueto Claim, in the light most favorable to ABHI (as the non-moving party on Count II of ABHI's Counterclaim). Mr. Moyer, who has worked in the insurance industry for over 44 years and has been involved in claims handling throughout that time, concluded that St. Paul's handling of the Cueto Claim deviated in many ways from generally accepted standards, customs and practices, and that St. Paul impermissibly placed its own financial interests over those of its insured. (JA-1418). Mr. Moyer's expert opinions provide additional strong support for ABHI's

claim that St. Paul violated its statutory duties to act in good faith in its handling of the Cueto Claim and are an additional basis compelling denial of St. Paul's request for summary judgment.

In granting summary judgment to St. Paul, the district court essentially ignored all of this evidence and made factual findings that in the face of a "nightmare situation," St. Paul acted "diligently and promptly and made its judgments on an informed basis …." (JA-691). Should this Court hold that St. Paul owed ABHI coverage for the Cueto Action, it should also remand with instructions that ABHI be allowed to present its statutory claim at trial.

## **CONCLUSION**

Based on undisputed facts, St. Paul's two coverage defenses, late notice and "breach of duty to defend," fail as a matter of Maryland law. The Court should reverse the district court's summary judgment order and remand with instructions that partial summary judgment be entered in ABHI's favor in the form of a declaration that St. Paul is responsible for reimbursing ABHI its reasonable fees and expenses incurred in defending against the Cueto Action and in litigating this insurance coverage action. Alternatively, this Court should reverse the summary judgment entered in St. Paul's favor and instruct the district court to resolve ABHI's waiver and estoppel defenses via jury trial. The district court should also be instructed to permit ABHI be allowed to present its statutory claim at trial.

Respectfully submitted,

*/s/   Albert J. Mezzanotte, Jr.*

Albert J. Mezzanotte, Jr.
Dwight W. Stone, II
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland  21202
410-347-8700

*Counsel for Appellant,*
  *American Bank Holdings, Inc.*

## REQUEST FOR HEARING

Pursuant to Fourth Circuit Local Rule 34(a), Appellant American Bank Holdings, Inc. ("ABHI") requests the Court to hear argument of this appeal. First, this appeal presents important issues of Maryland law governing liability insurance that deserve to be addressed in a published opinion. These include whether increased defense costs by themselves constitute "actual prejudice" for purposes of Maryland's notice-prejudice statute, and whether an insured breaches a standard form "duty to defend" provision when a mistake allows a default judgment to be entered against it, even if it prevails in the underlying litigation. No statute or Maryland appellate decision directly answers either of these questions; thus, ABHI has filed a Motion to Certify Questions of Law to the Court of Appeals of Maryland, in part because published guidance from Maryland's highest court would greatly benefit the insurance industry and Maryland policyholders. Should this Court decide not to certify questions to the state court, it should publish its own decision of this appeal, which cannot occur unless the Court holds oral argument. Local Rule 36(a).

Second, the procedural and factual record of this insurance coverage litigation and the underlying Illinois lender liability litigation is quite complex, spanning approximately seven years. Oral argument would give the Court the

opportunity to have counsel clarify any questions regarding the facts, procedural

history, or positions taken by the parties during the history of the litigation.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [ 13,982 ] words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 version 14.0.7151.5001 in 14pt Times New Roman.

Dated:        August 5, 2015            /s/   *Dwight W. Stone, II*
                                         Dwight W. Stone, II
                                          *Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2015 I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

>Thomas J. Judge
>Brent H. Olson
>Loss, Judge & Ward, LLP
>Two Lafayette Centre
>1133 21st Street, NW, Suite 450
>Washington, DC 20036
>(202) 778-4065
>*Attorneys for Appellee,*
>  *St. Paul Mercury Insurance Co.*

I further certify that on this 5th day of August, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

>    */s/   Dwight W. Stone, II*
>Dwight W. Stone, II
>  *Counsel for Appellant*